2022 IL App (1st) 172116

FIRST DISTRICT
THIRD DIVISION
March 30, 2022

No. 1-17-2116

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 98 CR 23300(01) |
| | ) | |
| MANUEL ACEITUNO, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Diane G. Cannon, |
| | ) | Judge Presiding. |

JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Justice Howse and Justice Burke concurred in the judgment and opinion.

## OPINION

¶ 1    Defendant Manuel Aceituno appeals the trial court's denial of his motion for leave to file his *pro se* successive postconviction petition. Relying on recent caselaw following the Supreme Court's decision in *Miller v. Alabama*, 567 U.S. 460 (2012), and the evolving societal standards governing the sentencing of youthful offenders, defendant argues on appeal that he has established cause and prejudice for the filing of an as-applied challenge that his 48-year sentence is an unconstitutional *de facto* life sentence under both the eighth amendment to the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) because he was 18 years old at the time of the offense.

¶ 2    In September 1998, defendant and his codefendant Paul Koroluk were charged by indictment with multiple counts of first degree murder, attempted first degree murder, and

aggravated discharge of a firearm arising from the August 1, 1998, shooting death of Colin

Ehlers. This court set forth the facts of this case in a previous Rule 23 order affirming the

summary dismissal of defendant's initial postconviction petition. See *People v. Aceituno*, No. 1-

03-2555 (unpublished order under Illinois Supreme Court Rule 23). We incorporate that order by

reference and repeat here only the facts needed to determine the issues before us.

¶ 3    Defendant's jury trial began in April 2000. After the testimony of two witnesses,

defendant entered into an open plea agreement for one count of first degree murder. The

evidence presented by the two witnesses

> "established that on August 1, 1998, the victim, Colin Ehlers, was present at a
>
> birthday party when defendant and Koroluk, who were uninvited guests, appeared
>
> at the party. Koroluk walked over to the victim and a group of his friends and
>
> introduced himself. Sometime during the conversation Koroluk alleged that
>
> someone called him [a] 'c**k.' While the victim was attempting to calm Koroluk,
>
> Koroluk pulled out a loaded gun and said to the victim 'who is the tough guy
>
> now.' As Koroluk pointed the gun at the victim, defendant approached the victim
>
> and 'punched him in the face.' Defendant then took the gun from Koroluk and
>
> began pointing it at the victim. A friend of the victim, John Macari, [testified that
>
> he] stepped in front of the victim and defendant 'put the gun' on Macari's head
>
> and shouted several times 'I will kill you[, ] you don't think I will kill you [?]'
>
> Subsequently, defendant refocused his attention on the victim and stated that he
>
> was going to kill him, and aimed the gun at the victim's genitals. Defendant and
>
> Koroluk began walking backwards towards a fence and their car. When they
>
> reached the fence, defendant fired three shots at the group. Two of the bullets

missed, but the third bullet entered the front of the victim's face just to the left of his nose, killing the victim. Defendant was arrested and confessed in a handwritten statement to being the person who fired the shots which killed the victim." *Aceituno*, No. 1-03-2555, at 1-2.

In addition, Macari testified that he identified defendant in a lineup on August 2, 1998.

¶ 4    Following Macari's testimony, defendant informed the court that he wished to change his plea from not guilty to guilty. In exchange for defendant's plea of guilty to first degree murder, the State dismissed the remaining charges of attempted first degree murder and aggravated discharge of a firearm. The trial court observed that the parties previously had a Supreme Court Rule 402 conference and defendant had rejected the prior plea offer. The court accepted defendant's plea and ordered a presentence investigation report (PSI). The court further admonished defendant that it could sentence defendant to less time or more time than the sentencing offer of 45 years discussed at an earlier conference. The trial court then admonished defendant in accordance with Rule 402 (Ill. S. Ct. R. 402 (eff. July 1, 1997)). The court asked defendant if any promises had been made to him regarding the sentence he could receive, defendant answered no. The court asked defendant if he understood that the sentencing range for first degree murder was 20 to 60 years, and defendant said he understood. The court further admonished defendant that he would be subject to three years of mandatory supervised release upon his release from prison. The court asked defendant if any threats were made to him to get him to plead guilty and defendant answered in the negative. The court also asked if defendant understood that his attorney was ready, willing, and able to proceed with the trial, and defendant answered yes. The court admonished defendant about the nature of the offense to which he was pleading guilty, and defendant answered that he understood. The court further admonished

defendant that by pleading guilty, the trial would not proceed, and he would not be confronting witnesses against him, calling his own witnesses, or testifying on his own behalf. Defendant responded that he understood. The court acknowledged accepting defendant's jury waiver.

¶ 5        At the conclusion of the plea hearing, which took place immediately after the State's two witnesses had testified in open court, the court found that "the record amply supports a factual basis." The court concluded that "there's a factual basis for the plea; that the defendant is entering a plea freely, knowingly, and voluntarily." The court then entered a finding of guilty to the charge of first degree murder.

¶ 6        At the subsequent sentencing hearing, the State presented the testimony of Ehlers's parents in aggravation. In allocution, defendant expressed his regret and apologized for taking Ehlers's life. He stated that he "made a very fatal and destructive mistake" and he "was not in [his] proper and right state of mind" because he had been drinking "most of that night." Defendant further stated that "it's my hope to simply have you hear it from me that your son did not deserve and greatly endure [*sic*] that tragic night of August 1st, 1998, that I am so, so very sorry in taking your child." At the time of the sentencing hearing, the sentencing range for first degree murder was 20 to 60 years in prison. See 730 ILCS 5/5-8-1(a)(1)(a) (West 2000). In aggravation, the prosecutor argued that defendant was a violent gang member with juvenile criminal offenses while Ehlers was a promising college graduate and asked for the maximum sentence of 60 years.

¶ 7        Defendant's PSI indicated two juvenile convictions, burglary to an automobile and unlawful use or possession of a weapon. The PSI also disclosed that his father was an alcoholic and his mother was a recovering drug addict. Defendant's childhood was "rough" because "he grew up in a neighborhood where people sold drugs and were involved in street gangs" as well

4

as his parents' substance abuse issues. He completed the eighth grade and later stopped attending high school after seven days due to gangs. Defendant indicated that he had a problem with alcohol and prior to his incarceration, he was consuming a case of beer and a fifth of tequila daily. Defendant was involved with the C-Notes street gang since he was 10 years old but held no rank or role in the gang structure.

¶ 8      In mitigation, defense counsel pointed out that defendant had an IQ of 81 and stressed defendant's parents' addiction issues. Defense counsel also pointed out that defendant had some rehabilitative potential and asked for a sentence of 40 years.

¶ 9      Following arguments, the trial court made the following findings before imposing defendant's sentence. The court acknowledged that this was "a horrendous situation" with a party and "a stupid argument" that led to "something that it should not have led to." The court discussed the gang involvement and how people are suddenly "sworn enemies because they came up with this stupid teenage gang that causes them to shoot at each other ***." Instead of making an opportunity to increase his base of friends or enjoy himself with people beyond his "own little niche of friends," codefendant introduced a gun and defendant was the "one that took that weapon and fired it." The court found this was "outrageous conduct" that was "[t]otally improper, unnecessary" since they were leaving the party. The court noted:

> "Not to say that shooting a gun in the air is good, but why wasn't it just shot in the air if it's going to be shot at all, and it should not have been, or into the ground? Wouldn't that have shaken everybody up? You could have had a laugh about that and gone on your way and still have your whole life ahead of you. Instead you had to aim it at people and kill somebody. It's just absolutely horrendous and a very bad act on your part."

¶ 10    The trial court discussed the evidence in aggravation and mitigation. The judge also noted the victim impact statements and testimony from Ehlers' parents and observed that defendant needed to listen to "the mother and father of the child he killed ***." The court acknowledged that no parent should ever outlive a child, but that is what happened in the case. The court pointed out that both families were losing a son with defendant's family losing him to the penitentiary. The judge further discussed defendant's family background, including his parents' addiction issues. But the court observed that there comes a point when defendant gets older and makes decisions in his life. The court considered defendant's prior juvenile offenses; burglary to an automobile for which he received probation and then while on probation, he was charged with unlawful use of a weapon that led to a sentence in the Juvenile Department of Corrections. The court noted that while defendant did not originally have the gun that night, he took possession of it and fired at someone, even after his prior delinquency related to a firearm.

¶ 11    The court also addressed defendant's "eloquent" letter expressing remorse. The trial court considered the PSI, reviewed all the factors in aggravation and mitigation, and then sentenced defendant to a term of 48 years. Defendant filed a motion to reconsider and reduce his sentence, which the trial court denied.

¶ 12    Defendant appealed the denial of his motion to reconsider his sentence. In an order, this court allowed the State's confession of error and remanded the case to the trial court for further consideration of defendant's motion to reconsider his sentence pursuant to Supreme Court Rule 604(d) (Ill. S. Ct. R. 604(d) (eff. Jul. 1, 2017)). *People v. Aceituno*, No. 1-00-1789. In September 2001, the trial court denied defendant's motion to reconsider his sentence. Defendant appealed the second denial of his motion to reconsider sentence and the public defender filed a motion to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967). This court allowed the motion

6

and affirmed defendant's sentence. *People v. Aceituno*, No. 1-01-3872 (2002) (unpublished order under Illinois Supreme Court Rule 23).

¶ 13    In June 2003, defendant filed his initial *pro se* postconviction petition in which he alleged that: (1) his sentence of 48 years was disparate to the sentence received by codefendant; (2) trial counsel was ineffective for failing to continue his sentencing hearing for the purpose of utilizing the mitigating factors introduced at codefendant's sentencing as mitigation; (3) trial counsel was ineffective for failing to present mitigating evidence regarding the factual events related to the shooting; (4) appellate counsel was ineffective for omitting defendant's sentencing challenges on appeal; and (5) evidence should have been suppressed at the sentencing phase of his proceeding pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). The trial court dismissed defendant's petition at the first stage of proceedings and found it was frivolous and patently without merit. On appeal, defendant argued he set forth the gist of a meritorious claim that his 48-year sentence, from an open guilty plea for first degree murder, was grossly disparate to codefendant's 18-year sentence from a plea of guilty to two counts of aggravated discharge of a firearm. A different panel of this court affirmed the trial court's dismissal and found the record did not support defendant's claim that a sentencing disparity violated his constitutional rights. *Aceituno*, No. 1-03-2555 (2004) (unpublished order under Illinois Supreme Court Rule 23).

¶ 14    In May 2017, defendant filed his *pro se* motion for leave to file a successive postconviction petition. Defendant argued that the imposition of his 48-year sentence amounted to a *de facto* natural life sentence and violated the eighth amendment because he was 18 years old at the time of the offense. According to defendant, the trial court failed to consider his youthfulness at the time his sentence was imposed. He maintained that his claim satisfied the cause and prejudice test because the holdings of *Miller v. Alabama*, 567 U.S. 460 (2012) and its

7

progeny were previously unknown to him as they were recently issued, and without that argument, he was prejudiced by being denied his right to due process in his sentencing hearing. Defendant attached three articles discussing the developing brain of a young adult to his petition. In June 2017, the trial court denied defendant leave to file his successive postconviction petition.

¶ 15    This appeal followed.

¶ 16    On appeal, defendant argues that the trial court erred in denying him leave to file his successive postconviction petition because his 48-year sentence constituted a *de facto* natural life sentence in violation of eighth amendment of the United States Constitution (U.S. Const., amend. VIII.) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11).

¶ 17    The sentencing of juvenile and youthful offenders has been evolving in the country over the last several years. Beginning with *Roper v. Simmons*, 543 U.S. 551 (2005), the United States Supreme Court weighed in and set forth new constitutional parameters for the sentencing of juvenile offenders. See also *Graham*, 560 U.S. 48; *Miller*, 567 U.S. 460; *Montgomery v. Louisiana*, 577 U.S. 190, 209-12 (2016). "[T]he United States Supreme Court has advised that 'children are constitutionally different from adults for purposes of sentencing.' " *People v. Lusby*, 2020 IL 124046, ¶ 32 (quoting *Miller*, 567 U.S. at 471). "The Court outlawed capital sentences for juveniles who commit murder in *Roper* and capital sentences for juveniles who commit nonhomicide offenses in *Graham*. And in *Miller*, the Court barred mandatory life sentences for juveniles who commit murder." *Id. Miller* has since been held to apply retroactively. *Montgomery*, 577 U.S. at 212; see also *People v. Holman*, 2017 IL 120655, ¶ 38 (recognizing that *Miller* applied retroactively). Most recently, the Supreme Court held that the eighth amendment allows juvenile offenders to be sentenced to life without parole as long as the

sentence is not mandatory and the sentencing court had discretion to consider youth and attendant characteristics but that no factfinding by the sentencer is required. *Jones v. Mississippi*, 593 U.S.____, ____, 141 S. Ct. 1307, 1314-15 (2021).

¶ 18     In light of these cases from the United States Supreme Court, the Illinois Supreme Court has developed its own evolving jurisprudence regarding *Miller*-related sentencing claims raised by juvenile and young adult defendants. In *People v. Reyes*, 2016 IL 119271, ¶ 9, the supreme court relied on *Miller* to conclude that a *de facto* life sentence violated the eighth amendment when applied to juveniles. The *Reyes* court observed that "*Miller* makes clear that a juvenile may not be sentenced to a mandatory, unsurvivable prison term without first considering in mitigation his youth, immaturity, and potential for rehabilitation." *Id*. Later, in *People v. Holman*, 2017 IL 120655, ¶ 46, the court applied *Miller*'s reasoning to conclude that a court could not constitutionally exercise its discretion to impose a life sentence without parole for a juvenile unless it took into consideration the defendant's "youth and attendant characteristics." The supreme court in *People v. Buffer*, 2019 IL 122327, ¶¶ 41-42, concluded that a sentence over 40 years is considered a *de facto* life sentence for juvenile defendants, requiring the sentencing court to consider the defendant's youth and attendant circumstances. Most recently, in *People v. Dorsey*, 2021 IL 123010, ¶ 64, the supreme court held that, when the applicable statutory good-conduct scheme provides a juvenile defendant some meaningful opportunity to obtain release after serving 40 years or less incarceration, the defendant's sentence is not a *de facto* life sentence in violation of the eighth amendment to the United States Constitution.

¶ 19     Most of these recent cases considered the sentencing claims of juvenile offenders. In *People v. Harris*, 2018 IL 121932, the 18-year-old defendant on direct appeal argued that his mandatory minimum aggregate term of 76 years' imprisonment violated the proportionate

penalties clause, noting that he had no prior criminal history and several other attributes that reflected his rehabilitative potential. The supreme court found that *Miller* did not directly apply to the defendant because he was an adult. *Id.* ¶ 45. The court further found his challenge was premature because the record did not "contain evidence about how the evolving science on juvenile maturity and brain development that helped form the basis for the *Miller* decision" applied to the defendant's specific facts and circumstances. *Id.* ¶ 46. The supreme court stated that the record needed to be developed and defendant's claim was more appropriate for another proceeding, such as a proceeding under the Post-Conviction Act. *Id.* ¶ 48. See also *People v. House*, 2021 IL 125124 (following *Harris* and remanding for further development of the record on *Miller*-related claims of a defendant who was 19 years old at the time of the offenses).

¶ 20    In this case, defendant turned 18 on July 21, 1998, and the offense occurred on August 1, 1998. As the supreme court found in *Harris*, *Miller* does not directly apply to adult defendants, but defendant asks this court to consider his sentencing claim for *Miller*-related protections as a young adult offender.

¶ 21    In addition to the initial briefing, the case before us has been subject to multiple requests to cite additional authority, supplemental briefing discussing the relevance of *Lusby*, 2020 IL 124046, supplemental briefing considering the applicability of *People v. Jones*, 2021 IL 126432, and oral arguments. Unlike many of the cases cited by defendant, this case involves a sentencing claim raised after a guilty plea. Thus, we first address whether defendant's guilty plea bars his sentencing claims under *Miller* because we find it dispositive of this appeal.

¶ 22    "It is well established that a voluntary guilty plea waives all non-jurisdictional errors or irregularities, including constitutional ones." *People v. Townsell*, 209 Ill. 2d 543, 545 (2004). In determining whether a legal claim has been waived, courts should examine the particular facts

and circumstances of a case, and waiver principles should be construed liberally in favor of the defendant. *People v. Phipps*, 238 Ill. 2d 54, 62 (2010). Further, " ' "[w]aivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." ' " *People v. Stroud*, 208 Ill. 2d 398, 403 (2004) (quoting *People v. Johnson,* 75 Ill. 2d 180, 187 (1979), quoting *Brady v. United States,* 397 U.S. 742, 748 (1970)).

¶ 23    Recently, the Illinois Supreme Court considered whether a defendant's guilty plea precluded a sentencing challenge under *Miller*. *Jones*, 2021 IL 126432. There, the defendant was charged with multiple offenses, including first degree murder, arising from the deaths of an elderly couple during a 1999 home invasion. *Id.* ¶ 3. The defendant was 16 years old at the time of the commission of the offenses. *Id*. In 2000, the defendant, then age 17, entered into a fully negotiated plea agreement with the State in which the defendant would plead guilty to one count each of first degree murder and residential burglary and two counts of armed robbery in exchange for the dismissal of the remaining charges and concurrent sentences of 50 years for murder, 30 years for each armed robbery count, and 15 years for residential burglary. *Id.* ¶ 4. The defendant waived the preparation of a PSI and a hearing on mitigating and aggravating factors, and the trial court entered judgment and sentence consistent with the plea agreement. *Id.* ¶ 5.

¶ 24    Subsequently, the defendant sought leave to file a successive postconviction petition, arguing that his 2000 guilty plea and judgment were entered years before the decision in *Miller* and that the mandatory statutory sentencing scheme that was applied to him at that time was void when applied to juveniles. *Id.* ¶ 7. The trial court denied the motion, and the appellate court affirmed the denial. *Id.* ¶¶ 7-10.

11

¶ 25 Before the supreme court, the defendant argued that the sentencing scheme in place at the time of his guilty plea violated the eighth amendment under *Miller* because if he had gone to trial and been convicted of committing two murders, he would have been subject to a mandatory life sentence. *Id.* ¶ 15. He further argued that in order to comply with *Miller*, the trial court was required to use its discretion before imposing a life sentence upon a juvenile offender. Since the mandatory life sentence precluded any discretion by the trial court, the defendant's sentence violated the eighth amendment as applied to him. *Id.* The defendant conceded that he was not sentenced under that statutory scheme, but maintained that "when he entered into the plea agreement with the State, he did not anticipate that the 50-year prison term stipulated in it would later be declared to be a *de facto* life sentence that required the trial court's use of discretion and consideration of his youthful characteristics and rehabilitative potential." *Id.* ¶ 19.

¶ 26 The supreme court rejected the defendant's arguments. The *Jones* court noted that the parties all understood the law applicable at the time of the plea, and thus, "[t]he crux of [the defendant's] claim is that none of [the parties] knew that the Supreme Court would later change the criteria for reviewing the constitutionality of the applicable law." *Id.* ¶ 19.

¶ 27 The supreme court then considered the defendant's plea agreement and pointed out that a voluntary guilty plea waives "all non-jurisdictional errors or irregularities, *including constitutional ones*." (Internal quotation marks removed and emphasis in the original.) *Id.* ¶ 20 (quoting *People v. Sophanavong*, 2020 IL 124337, ¶ 33, quoting *People v. Townsell*, 209 Ill. 2d 543, 545 (2004)). The court further noted that plea agreements are a contract and the principles of waiver apply equally to them. *Id.* ¶ 21. Guilty pleas allow defendants to gain a present benefit in exchange for the risk of losing out on future favorable legal developments. *Id.* (quoting *Dingle v. Stevenson*, 840 F.3d 171, 175 (4th Cir. 2016)).

¶ 28    In its analysis, the *Jones* court relied on the decisions in *Dingle* and *Brady v. United States*, 397 U.S. 742 (1970). In *Dingle*, the 17-year-old defendant was charged with numerous serious offenses, including murder. After the State filed a notice of its intent to seek the death penalty under South Carolina law, the defendant sought to avoid death by entering a guilty plea on all counts in exchange for a sentence of life in prison with the possibility of parole after 30 years. *Dingle*, 840 F.3d at 172. However, because the imposition of the defendant's consecutive sentences barred the possibility of parole, the defendant sought postconviction relief. *Id*. While his postconviction claims were pending, the Supreme Court's decision in *Roper* was issued. The defendant then argued that *Roper* was applicable to his claim and his guilty plea was involuntary because it was made for the sole purpose to avoid cruel and unusual punishment, *i.e.*, the death penalty. *Id*. at 173.

¶ 29    The *Dingle* court turned to the Supreme Court's decision in *Brady*. In that case, the defendant was facing the death penalty for a kidnapping in which the victim was harmed. After his codefendant, who had confessed, pled guilty and would be available to testify against him at trial, the defendant changed his plea from not guilty to guilty. The trial court subsequently sentenced him to a term of 50 years, which was later reduced to 30 years. *Brady*, 397 U.S. at 743-44. When changes in the law resulted in the defendant no longer being eligible for the death penalty, he attempted to withdraw his plea by claiming his plea was not voluntary. *Id*. at 744.

¶ 30    In its opinion, the Supreme Court reviewed the importance of a voluntary and knowing guilty plea.

> "That a guilty plea is a grave and solemn act to be accepted only with care and discernment has long been recognized. Central to the plea and the foundation for entering judgment against the defendant is the defendant's admission in open

court that he committed the acts charged in the indictment. He thus stands as a witness against himself and he is shielded by the Fifth Amendment from being compelled to do so—hence the minimum requirement that his plea be the voluntary expression of his own choice. But the plea is more than an admission of past conduct; it is the defendant's consent that judgment of conviction may be entered without a trial—a waiver of his right to trial before a jury or a judge. Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Id*. at 748.

¶ 31     The Supreme Court rejected the defendant's argument and found the record supported the lower courts' findings that his plea was both voluntarily and knowingly made. *Id*. at 749, 756. In its analysis, the Court observed the possible reasons why the defendant entered a plea of guilty.

"One of these circumstances was the possibility of a heavier sentence following a guilty verdict after a trial. It may be that Brady, faced with a strong case against him and recognizing that his chances for acquittal were slight, preferred to plead guilty and thus limit the penalty to life imprisonment rather than to elect a jury trial which could result in a death penalty." *Id*. at 749.

¶ 32     The *Brady* court further declined to hold that a guilty plea is "compelled and invalid under the Fifth Amendment whenever motivated by the defendant's desire to accept the certainty or probability of a lesser penalty rather than face a wider range of possibilities extending from acquittal to conviction and a higher penalty authorized by law for the crime charged." *Id*. at 751. According to the Court, the voluntariness of pleas is defined as follows.

" '[A] plea of guilty entered by one fully aware of the direct consequences,

14

including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (*e.g.* bribes).' " *Id.* at 755 (quoting *Shelton v. United States*, 242 F.2d 101, 115 (Tuttle, J., *dissenting*) (Fifth Cir., 1957), *rev'd on confession of error on other grounds*, 356 U.S. 26 (1958)).

¶ 33    The Supreme Court acknowledged the various factors under consideration when deciding whether or not to enter a guilty plea.

"Often the decision to plead guilty is heavily influenced by the defendant's appraisal of the prosecution's case against him and by the apparent likelihood of securing leniency should a guilty plea be offered and accepted. Considerations like these frequently present imponderable questions for which there are no certain answers; judgments may be made that in the light of later events seem improvident, although they were perfectly sensible at the time. The rule that a plea must be intelligently made to be valid does not require that a plea be vulnerable to later attack if the defendant did not correctly assess every relevant factor entering into his decision. A defendant is not entitled to withdraw his plea merely because he discovers long after the plea has been accepted that his calculus misapprehended the quality of the State's case or the likely penalties attached to alternative courses of action. More particularly, absent misrepresentation or other impermissible conduct by state agents, cf. *Von Moltke*

*v. Gillies*, 332 U.S. 708 (1948), a voluntary plea of guilty intelligently made in the light of the then applicable law does not become vulnerable because later judicial decisions indicate that the plea rested on a faulty premise. A plea of guilty triggered by the expectations of a competently counseled defendant that the State will have a strong case against him is not subject to later attack because the defendant's lawyer correctly advised him with respect to the then existing law as to possible penalties but later pronouncements of the courts, as in this case, hold that the maximum penalty for the crime in question was less than was reasonably assumed at the time the plea was entered." *Id*. at 756-57.

¶ 34    The *Brady* court thus concluded that while the defendant's guilty plea may have been motivated to avoid the death penalty, the plea was voluntarily and intelligently made. *Id*. at 758.

¶ 35    The Fourth Circuit Court of Appeals in *Dingle* observed that "the logic in *Brady* applies generally, regardless of the reason that a defendant is no longer death eligible." *Dingle*, 840 F.3d at 175. The *Dingle* court further found:

"Contracts in general are a bet on the future. Plea bargains are no different: a classic guilty plea permits a defendant to gain a present benefit in return for the risk that he may have to forego future favorable legal developments. [The defendant] received that present benefit—avoiding the death penalty and life without parole—under the law as it existed at the time. Although *Roper*, in hindsight, altered the calculus underlying [the defendant's] decision to accept a plea agreement, it does not undermine the voluntariness of his plea. Some element of pressure exists in every deal, as the tradeoff between present certainty and future uncertainty is emblematic of the process of plea

bargaining. *Brady* makes all that exceptionally clear and in following its teachings we find no infirmity in the plea that [the defendant] entered." *Id*. at 175-76.

¶ 36    Turning back to *Jones*, the defendant attempted to distinguish *Brady* on the basis that his plea was entered to avoid a mandatory natural life sentence in contrast to the defendant in *Brady* who pled guilty to avoid a potential death sentence. The supreme court rejected the defendant's argument, noting it would be "purely speculative" for the court to conclude that the defendant would have been convicted of the most serious charges against him at trial and sentenced to mandatory life without parole. *Jones*, 2021 IL 126432, ¶¶ 24-25.

¶ 37    Moreover, the supreme court found that the defendant's "current effort to undo the effects of his guilty plea shares much common ground with that of the defendant in *Brady*." *Id*. ¶ 26. The court observed that both defendants entered a plea " 'to avoid a potential, not a certain, sentence.' " *Id*. "Because the principles that were considered and applied in *Brady* and *Dingle* operate here with equal force, we conclude that [the defendant's] knowing and voluntary guilty plea waived any constitutional challenge based on subsequent changes in the applicable law." *Id*.

¶ 38    Further, the defendant's "*Miller* claims require him to show that the *de facto* life sentence he received was not entered as a result of the trial court's use of its discretion since both this court and the Supreme Court permit the imposition of discretionary life sentences on juvenile offenders." *Id*. ¶ 27. In rejecting the defendant's claims, the supreme court pointed out that the trial court was not required to accept the parties' fully negotiated plea agreement, which "necessarily constituted an exercise of its discretion" with respect to the defendant's sentence. *Id*. Therefore, the *Jones* court held that the defendant's constitutional claims were not cognizable under *Miller* and the trial court did not err in denying the defendant's motion for leave to file a successive postconviction petition. *Id.* ¶ 28.

¶ 39    We find the supreme court's holding dispositive to defendant's claims before us. The *Jones* court examined and rejected the same arguments presented to us, holding that the defendant was not entitled to relief. *Id.* ¶¶ 25-28. Critically, since the supreme court denied postconviction relief to a juvenile defendant, it is clear that the holding would apply with equal force to defendant here, who was 18 years old at the time of the offense.

¶ 40    At defendant's guilty plea proceedings, the trial court fully complied with Supreme Court Rule 402 during defendant's plea hearing. Rule 402(a) requires the trial court to admonish:

> "the defendant personally in open court, informing him or her of and determining that he or she understands the following: (1) the nature of the charge; (2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences; (3) that the defendant has the right to plead not guilty, or to persist in that plea if it has already been made, or to plead guilty; and (4) that if he or she pleads guilty there will not be a trial of any kind, so that by pleading guilty he or she waives the right to a trial by jury and the right to be confronted with the witnesses against him or her; or that by stipulating the evidence is sufficient to convict, he or she waives the right to a trial by jury and the right to be confronted with any witnesses against him or her who have not testified." Ill. S. Ct. R. 402(a) (eff. July 1, 1997).

Rule 402(b) further provides that the trial court:

> "shall not accept a plea of guilty without first determining that the plea is voluntary. If the tendered plea is the result of a plea agreement, the agreement shall be stated in open court. The court, by questioning the defendant personally

in open court, shall confirm the terms of the plea agreement, or that there is no agreement, and shall determine whether any force or threats or any promises, apart from a plea agreement, were used to obtain the plea." Ill. S. Ct. R. 402(b) (eff. July 1, 1997).

Rule 402(c) also requires that the trial court "shall not enter final judgment on a plea of guilty without first determining that there is a factual basis for the plea." Ill. S. Ct. R. 402(c) (eff. July 1, 1997).

¶ 41    The trial court admonished defendant as to each of the four requirements in Rule 402(a) and defendant responded on the record that he understood each of them. Defendant never moved to withdraw his guilty plea, nor did he file a direct appeal seeking to withdraw his guilty plea. Defendant has not alleged that his plea was not voluntarily or intelligently made, nor has he argued that the trial court lacked jurisdiction or that the State engaged in any misrepresentation or committed any misconduct. In compliance with Rule 402(b) and (c), the trial court stated on the record that it found an ample factual basis for the plea and that defendant entered the plea "freely, knowingly, and voluntarily." Accordingly, defendant's "knowing and voluntary guilty plea waived any constitutional challenge based on subsequent changes in the applicable law." *Jones*, 2021 IL 126432, ¶ 26.

¶ 42    At the conclusion of the plea hearing, the court found that "the record amply supports a factual basis." The court concluded that "there's a factual basis for the plea; that the defendant is entering a plea freely, knowingly, and voluntarily." The court then entered a finding of guilty to the charge of first degree murder.

¶ 43    In his supplemental brief addressing *Jones*, defendant argues that *Jones* has no impact on his claim because defendant entered into a blind plea agreement. Specifically, defendant

19

contends that because he entered a blind plea agreement, unlike the defendant in *Jones*, who entered into a negotiated plea agreement, the *Jones* decision has no application to his constitutional claims. In contrast, the State asserts that *Jones* forecloses defendant's claim because defendant was not subject to a mandatory sentencing scheme and the trial court exercised its discretion in imposing defendant's sentence.

¶ 44    Although the outcome in this appeal does not hinge upon whether defendant's guilty plea was a blind plea versus a negotiated one, his claim that he entered into a blind plea is not entirely accurate. There are several categories of guilty pleas which can occur as a result of a defendant's decision to forego the right to a trial. Justice Freeman, in a special concurrence in *People v. Linder*, 186 Ill. 2d 67, 77-78 (1999), discussed those different types of plea agreements. Here is how he described four distinct plea scenarios that usually occur when a defendant enters a guilty plea.

"(a) The 'open' or 'blind' plea- [where] defendant pleads guilty without any inducement from the State, and the circuit court exercises its full discretion and determines the sentence to be imposed at the conclusion of a sentencing hearing.

(b) The 'negotiated as to charge' plea- [where] defendant pleads guilty solely in exchange for the State's dismissal of remaining or outstanding charges. This type of plea can also include situations in which the defendant agrees to plead guilty in exchange for the State' reduction of the original charge to a lesser offense. In either case, the circuit court exercises its full discretion and determines the sentence to be imposed at the conclusion of a sentencing hearing. Under this scenario, despite the existence of the agreement, the State retains its ability to

20

argue at the sentencing hearing for a sentence from the full range of penalties provided for in the Code of Corrections including maximum sentences and extended terms.

(c) The 'negotiated as to charge and/or sentence' plea- [where] defendant pleads guilty in exchange for the State's dismissal of remaining or outstanding charges and recommendation of a sentencing cap or range. In certain cases, defendant will only agree to plead guilty as charged in exchange for a sentence recommendation or range. Under this scenario, the State's ability to argue at the hearing for a sentence within the full range of penalties provided for in the Code of Corrections is limited by the parameters of its agreement with defendant.

(d) The 'fully' negotiated plea- [where] defendant pleads guilty in exchange for the State's dismissal of charges and agreed upon sentence, and trial court accepts plea and sentences according to the agreement." *Id*. (Freeman, J., *specially concurring*.)

¶ 45    Here, contrary to defendant's assertion, defendant's plea was not truly a blind plea, but rather falls into the second category, negotiated as to charge, because in exchange for defendant's plea of guilty to first degree murder, the State dismissed the remaining charges of attempted first degree murder and aggravated discharge of a firearm.

¶ 46    Defendant also incorrectly focuses on the differences between a fully negotiated plea agreement and an open plea agreement as it relates to a defendant's ability to challenge his sentence. He notes that a fully negotiated guilty plea is governed by principles of contract law and a defendant may not challenge his or her sentence without withdrawing his or her guilty plea. *People v. Absher*, 242 Ill. 2d 77, 87 (2011). He also points out that defendants who enter

21

open guilty pleas are allowed to challenge only their sentences without being required to withdraw their guilty pleas because the trial court had discretion to impose the sentence. *People v. Evans*, 174 Ill. 2d 320, 332 (1996).

¶ 47    While defendant's discussion is legally correct, his analysis is flawed because *Jones* did not turn on the fact that the defendant there entered into a negotiated plea. The issue is not whether defendant's plea required him to first seek to withdraw his guilty plea before challenging his sentence. But instead, the question raised in *Jones* is whether the defendant waived his constitutional claim by entering a plea of guilty. Significantly, none of the cases defendant acknowledges turned on whether the guilty plea was a blind or negotiated plea but on the well-established rule that a voluntary, knowing, and intelligent guilty plea waives constitutional claims. See *People v. Sophanavong*, 2020 IL 124337, ¶ 33; *People v. Townsell*, 209 Ill. 2d 543, 545 (2004). Further, defendant's argument that he does not want to vacate his underlying guilty plea while challenging his sentence is a distinction without a difference because he still seeks to undo the effects of his plea. Similar to the situation in *Brady*, defendant's plea was precipitated by the critical evidence that had been presented against him at the very beginning of his jury trial. In *Brady*, it was the potential testimony of a codefendant, while here, defendant had just heard the compelling testimony recounting defendant firing multiple gunshots at partygoers, killing Colin Ehlers. Given that defendant was being tried on charges in addition to first degree murder, his motivation to change his plea, as in *Brady*, was to avoid a longer sentence.

¶ 48    As in previous precedent and as pointed out directly above, the *Jones* court followed the longstanding principle that a knowing and voluntary plea waives constitutional rights. "By entering a plea agreement, a defendant 'forecloses any claim of error. "It is well established that

a voluntary guilty plea waives all non-jurisdictional errors or irregularities, *including constitutional ones.*" ' " (Emphasis in original.) *Jones*, 2021 IL 126432, ¶ 20 (quoting *Sophanavong*, 2020 IL 124337, ¶ 33, quoting *Townsell*, 209 Ill. 2d 543, 545 (2004)). Thus, the supreme court's analysis did not turn on whether the defendant's plea was fully negotiated or not, but whether the plea was knowing and voluntary. Defendant does not challenge that his plea was knowing and voluntary. Nothing in his plea proceedings indicates that his plea was anything other than knowing and voluntary. We also reject any suggestion by defendant that his waiver applied only to constitutional claims existing at the time of his plea. As the supreme court found in *Jones*, defendant's "knowing and voluntary guilty plea waived any constitutional challenge based on subsequent changes in the applicable law." *Id.* ¶ 26.

¶ 49 An argument similar to defendant's was raised in *People v. Jackson,* 199 Ill.2d 286 (2002). In that case, the defendant was charged with aggravated battery causing great bodily harm. *Id*. at 288. The offense occurred when the defendant confronted the victim about the defendant's boyfriend. The defendant, who had been consuming alcohol, parked behind the victim's car, exited her car, and walked over to the victim's car. The defendant then attacked the victim through her car window with a box cutter, "slashing her about the face and neck," with one of the wounds requiring over 100 stitches. The defendant continued to cut the victim as the victim tried to move away from her assault. *Id*. at 290-91.

¶ 50 Initially the defendant entered a plea of not guilty, but she later changed her plea to guilty pursuant to an agreement with the State that it would not seek an extended-term sentence. *Id*. at 288. At the plea hearing, the defendant disclosed that she was 18 years old and had completed the tenth grade. While in school, the defendant was placed in special education due to learning difficulties, but she was not disabled. *Id*. at 289. The trial court admonished the defendant that

she had been charged with aggravated battery, a Class 3 felony, with a normal sentencing range of two to five years, but she could be sentenced to an extended term of 5 to 10 years' imprisonment in various circumstances. The court specifically noted that she could receive an extended term at her sentencing hearing if the court found that "this felony offense was accompanied by exceptionally brutal or heinous behavior, indicative of wanton cruelty." *Id*. The defendant indicated that she understood. *Id*.

¶ 51    Additionally, the supreme court carefully set forth the trial court's detailed confirmation that the defendant understood the rights she was waiving by pleading guilty. *Id*. at 289-90. The trial court specifically asked the defendant if she understood that she was presumed to be innocent of the charge, the burden was on the State to prove her guilty beyond a reasonable doubt of aggravated battery, and that the presumption of innocence did not go away until either a jury in a jury trial or a judge in a bench trial found her guilty. The defendant indicated that she understood. The court then explained that by pleading guilty, she would lose her right to a trial and confirmed that she understood what a jury trial was. She responded that she understood. The court detailed that in a jury trial all 12 jurors had to agree that the State has satisfied its burden of proof beyond a reasonable doubt, but by pleading guilty she waived this right to a trial. The court asked if she understood the presumption of innocence, and she responded she did. The court next asked if she understood that by pleading guilty, she was waiving the State's burden to prove her guilty beyond a reasonable doubt. She answered that she understood. The court confirmed that she was waiving her right to a trial of any kind, and the defendant indicated that she understood. *Id*. The defendant also "indicated that she understood and was giving up her rights to the assistance of an attorney, of confrontation and cross-examination of witnesses against her, to subpoena witnesses in her favor, and her right to testify or not to testify in her own behalf." *Id*. at

24

290.

¶ 52    Later, following the sentencing hearing, the trial court discussed the premeditated and extreme nature of the crime, including that the victim had been permanently blinded in one eye with permanent scars on her face, and then sentenced the defendant to the maximum extended-term sentence of 10 years in prison. *Id.* at 291-92.

¶ 53    On appeal, the defendant argued that her sentence violated due process pursuant to *Apprendi v. New Jersey*, 530 U.S. 466 (2000), but the Fourth District rejected this claim because the defendant's guilty plea waived her sentencing challenge. *Id*. at 292 (citing *People v. Jackson*, 319 Ill. App. 3d 110 (2001)). In *Apprendi*, the United States Supreme Court held that "a New Jersey 'hate crime' statute ran afoul of the due process clause of the fourteenth amendment (U.S. Const., amend. XIV), because it permitted the trial court to impose an extended term of imprisonment based on a finding by the court, by a preponderance of the evidence, regarding a defendant's motives." *Id*. at 295. The *Apprendi* court held that as a component of due process, "a criminal defendant has the right to require the prosecution to prove to a jury, beyond a reasonable doubt, all facts necessary to establish the range of penalties potentially applicable to the defendant." *Id*. at 295 (citing *Apprendi*, 530 U.S. at 476-77). The Illinois Supreme Court summarized that the "underlying lesson of *Apprendi* is, 'put simply, facts that expose a defendant to a punishment greater than that otherwise legally prescribed were by definition "elements" of a separate legal offense.' " *Id*. at 295-96 (quoting *Apprendi,* 530 U.S. at 483 n. 10).

¶ 54    Before the Illinois Supreme Court, the defendant argued that her sentence violated due process based on *Apprendi* because her extended term sentence was premised on the trial court's finding that the defendant's conduct was brutal and heinous rather than *Apprendi*'s requirement that the prosecution prove each element of the charged crime beyond a reasonable doubt. The

State responded that the defendant had waived her sentencing claim by pleading guilty. Thus, the question considered by the supreme court was whether the defendant waived her sentencing challenge under *Apprendi* by pleading guilty to the offense with full knowledge that the court could impose an extended term sentence. *Id*. at 294-95.

¶ 55    The *Jackson* court acknowledged that, under *Apprendi,* "[e]very fact necessary to establish the range within which a defendant may be sentenced is an element of the crime and thus falls within the constitutional rights of a jury trial and proof beyond a reasonable doubt." *Id*. at 296. However, the court observed, by pleading guilty, "a defendant *waives exactly those rights.*" (Emphasis in original.) *Id*. Moreover, "[a] knowing relinquishment of the right to a trial by jury is the *sine qua non* of a guilty plea." *Id*. Thus, the *Jackson* court concluded that "*Apprendi*-based sentencing claims cannot be heard on appeal from a guilty plea." *Id*.

¶ 56    *Jackson*'s analysis is helpful here. Like the defendant in *Jackson*, defendant entered a plea of guilty with the dismissal of at least some of the pending charges but no agreement as to sentencing. Also as the trial court in *Jackson* admonished the defendant that it could impose an extended term sentence, the trial court here clearly admonished defendant that the sentencing range was 20 to 60 years and it could impose a sentence anywhere in that range. His sentencing claims falls directly within the rights he waived by pleading guilty.

¶ 57    We further point out that the defendant's plea in *Brady* was not negotiated. See *Brady*, 397 U.S. at 743-44. As discussed above, the *Brady* court made no distinction between a blind plea and fully negotiated plea agreement. The *Jones* court relied on the same reasoning with approval. Regardless of whether defendant's plea was blind or negotiated, the type of plea makes no difference because *Jones* applies to all knowing and voluntary pleas. *Jones* does not suggest that its holding relates only to negotiated pleas. Here, defendant changed his plea to guilty after

hearing compelling eyewitness testimony of the events leading to Ehlers' murder. In entering a plea, defendant opted to seek a lower sentence rather than be found guilty by the jury and potentially receive the maximum term of 60 years.

¶ 58     Moreover, *Jones* requires that *Miller*'s additional protections for juvenile offenders apply only when a trial court lacks, or refuses to use, discretion in sentencing a juvenile offender to a life, or *de facto* life, sentence." *Jones*, 2021 IL 126432,  ¶ 28. In his supplemental brief, defendant fails to discuss the voluntary nature of his guilty plea and he also fails to discuss *Jones*'s mandate that *Miller* applies only when a trial court fails to exercise its discretion in sentencing a juvenile offender. This mandate in *Jones* is especially relevant in the case of a blind plea where the trial court explicitly has discretion in sentencing a defendant. See *id*. ¶¶ 27-28. Here, the trial court clearly exercised its discretion in imposing defendant's sentence. At sentencing, defendant sought a sentence of 40 years while the State requested a term of 60 years, and the trial court thereafter imposed a 48-year sentence. Accordingly, defendant's claims are not cognizable under *Miller*, and the trial court properly denied his motion for leave to file a successive postconviction petition.

¶ 59     Accordingly, we affirm the decision of the circuit court of Cook County.

¶ 60     Affirmed.

---

**No. 1-17-2116**

---

| | |
|---|---|
| **Cite as:** | *People v. Aceituno*, 2022 IL App (1st) 172116 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 98-CR-23300 (01); the Hon. Diane Gordon Cannon, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Emily E. Filpi, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham and Douglas P. Harvath, Assistant State's Attorneys, of counsel), for the People. |

---