2022 IL App (1st) 200642-U

THIRD DIVISION
May 4, 2022

No. 1-20-0642

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 05 CR 1855101 |
| | ) | |
| DEONTE SNOWDEN, | ) | Honorable |
| | ) | Timothy J. Joyce, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Justices Ellis and Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not err in the second-stage dismissal of defendant's postconviction petition where (1) defendant's sentencing claim based on *Miller* is barred by *res judicata* and, in the alternative, defendant's discretionary 27-year sentence is not entitled to *Miller* protections; and (2) defendant's ineffective assistance of counsel claim is barred by *res judicata*, and in the alternative, the claim was forfeited because defendant could have raised the claim on direct appeal.

¶ 2    Defendant Deonte Snowden appeals the trial court's second stage dismissal of his

postconviction petition, arguing his petition made a substantial showing that: (1) his 27-year

sentence violated the proportionate penalties under *Miller v. Alabama*, 567 U.S. 460 (2012); and

(2) his trial counsel was ineffective for failing to present his motion to suppress when the police questioned him about the offense prior to advising him of the *Miranda* warnings.

¶ 3     In August 2005, defendant was indicted on multiple counts of first degree murder in the stabbing death of Jataun Jennings. Following an April 2009 trial, the jury found defendant guilty of first degree murder.

¶ 4     Defendant's pretrial motion to suppress raised several claims, including that defendant was not informed of his *Miranda* rights prior to his interrogation. However, this motion was never litigated or formally withdrawn.

¶ 5     We outline the evidence presented at defendant's trial as necessary for our disposition of this appeal. A full discussion of defendant's trial was set forth in *People v. Snowden*, 2011 IL App (1st) 092117.

¶ 6     On July 12, 2005, Officer Tamica Rainey received a call about a person who had been stabbed and proceeded to 1114 East 73rd Street. When she arrived, she went up the stairs to the first level of apartments. Officer Rainey noticed blood on the carpeting of the stairs and along the wall as well as on the apartment door to her right. She saw Jennings to her left, lying on the stairs to the second level. Officer Rainey observed that Jennings had been stabbed multiple times and was covered in blood. She also saw stab wounds to the left side of Jennings' neck to her thighs and defensive wounds on her forearms. She immediately radioed for an ambulance to come to the scene.

¶ 7     Officer Rainey spoke with Jennings very briefly. Officer Rainey asked Jennings who did this to her and Jennings replied that she did not know. Jennings then asked the officer to get her baby. Officer Rainey asked where the baby was and then went upstairs. Officer Rainey went into apartment 2W and saw blood throughout the entire apartment but did not see the baby. She went

across the hall, where she saw blood on the wall and the door. She knocked on the door and the tenant in that apartment had the child. When Officer Rainey walked through Jennings' apartment, she observed a knife at the opening of the bedroom door. She notified her sergeant and an evidence technician was called. Jennings was subsequently transported to Stroger Hospital.

¶ 8    Detective Pat Hackett received an assignment on July 12, 2005, to go to 1114 East 73rd Street. When he entered Jennings' apartment, he saw a "horrific amount of blood on the floor." He also observed a knife next to the side of the bed on the bedroom floor and he described the knife as "a basic kitchen knife[,] *** a sharp carving knife." He saw a matching knife in the kitchen and the knives appeared to be a set. He did not see any signs of forced entry. Detective Hackett went to the hospital to look for Jennings, but was informed that she had been taken directly to surgery. He was later informed that Jennings had passed away.

¶ 9    Detective Patrick Durkin was assigned to Jennings' homicide shortly after 8 a.m. on July 12, 2005, along with his two partners, Detectives Alejandro Almazan and John Fassl. When he met with Jennings' family, he learned that Jennings had a cell phone, but it was not in her apartment after her murder. He found out Jennings' phone number and received information to access Jennings' Cingular account. He discovered that her phone number had been used after she had died.

¶ 10    An AT&T sales program execution analyst reviewed the cell phone subscriber information for Jennings' phone number, including the phone records showing all incoming and outgoing calls from July 11, 2005, to July 13, 2005. On July 11, the records reflect three phone calls were made to a phone number with a 773 area code between 10:30 and 10:45 p.m. The

phone number was next used for multiple calls just before 4 a.m. The phone then was used throughout the day of July 12.

¶ 11    The AT&T analyst discussed the subscriber identity module (SIM) card for Jennings' phone. The SIM card communicates with the network and is how one is able to make a phone call on the network and it is simple to replace a SIM card. The equipment history for Jennings' SIM card and phone indicated that Jennings' SIM card was used from 2:43 p.m. on July 12, 2005, until 9:07 p.m. on July 13, 2005, in an LG C1300 phone.

¶ 12    Detective Alejandro Almazan also reviewed Jennings' phone records. One of the phone numbers called from Jennings' phone number belonged to Danielle Jackson. When he spoke with Jackson, he asked to see Jackson's cell phone, which she gave him. He observed that her phone number matched one of the dialed calls made after Jennings' death. Detective Almazan asked her to call that number, which she did. Jackson had a conversation with the person and afterward, they went to 71st and Woodlawn. They were looking for a young man by the name of "Donte" or "Tay." He was a Black male, around 15, 16 years old.

¶ 13    When they arrived at that location at around 5 p.m., Detective Almazan observed several young Black males on the corner. He exited the vehicle to do a field interview. He identified defendant in court as the young man he approached. He asked defendant his name and he responded that it was Deonte Snowden. The detective asked if defendant was in possession of anything and defendant produced a Cingular LG flip phone. Defendant was with Tyree Bell and the officers recovered two additional phones from Bell. Both men were transported to Area 2. They were kept in separate areas at the station. The detectives contacted their parents.

¶ 14    At Area 2, the detectives questioned defendant and was asked how he was in possession of the telephone. Defendant responded that the phone belonged to him. The detectives asked him

4

how the phone was operating with Jennings' phone number, and defendant answered that on July 11, 2005, he switched the SIM card in his phone with one in the phone of a friend.

¶ 15    Defendant's mother arrived at the police station and spoke privately with defendant. Later, Detectives Almazan and Fassl had a second conversation with defendant. During that interview, defendant said that on July 10, 2005, he spent the night at Bell's apartment with another friend. Bell's apartment was across the hall from Jennings. The next morning, defendant and his friend went to throw trash in the dumpster and his friend pointed out to that Jennings' back door was open. They entered the apartment. Detective Almazan then stopped the conversation at that point and read defendant his *Miranda* warnings.

¶ 16    After receiving his *Miranda* warnings, defendant agreed to continue the conversation. When they entered the apartment, he saw two cell phones and a cell phone charger on the kitchen counter. He took one of the phones, which did not work, and his friend took the second phone and the charger. They left the apartment and returned to Bell's apartment. He left the cell phone at Bell's and returned around 11 p.m. that night to retrieve it. The interview ended at that time. Defendant's mother left and the detectives followed up on the investigation based upon the information from defendant.

¶ 17    The next morning, July 14, 2005, at approximately 5 a.m., Detective Almazan spoke with defendant's mother. She stated that she could return around 6 a.m., but she still had not arrived by 11:40 a.m. The detectives had a third conversation with defendant while a youth officer was present. Detective Almazan again advised defendant of his *Miranda* rights, which defendant waived, and agreed to speak with them. Defendant started to tell the same story, but the detectives told him he was not being truthful about how he got Jennings' SIM card because the

phone records indicated that Jennings used the phone after the time defendant said he was in her apartment.

¶ 18    Defendant then changed his story and stated that his friend went into the apartment first while he followed. He went through the entire apartment and found one cell phone and a charger on the kitchen counter. He took the phone and his friend took the charger. Defendant then heard his name being called outside by another friend and they left Jennings' apartment and closed the back door. Later, defendant went to 72nd and Woodlawn and met three men there. He told them he knew of a place where "there was a lick," which defendant explained was "somewhere that was easy to rob or burglarize." One of the men asked where "the lick" was and defendant told him it was across the hall from Bell's apartment, referring to Jennings' apartment. The man asked defendant what time he wanted to 'do the lick,' and defendant told the man he did not want to be there when it happened, but told him to go in through the back door because it would be open.

¶ 19    Defendant spent that night at a friend's house. He woke up around 11 a.m. on July 12, 2005, and walked to 72nd and Woodlawn with his friend. Defendant saw Bell's mother and she told them her neighbor had been stabbed that night. He then walked over to 71st and Woodlawn and saw the man he told about "the lick." Defendant asked the man what he had taken, and the man said he got a DVD player and a cell phone. Defendant asked for the cell phone, and he then switched his SIM card to the phone from Jennings' apartment. After this conversation, Detective Almazan continued his investigation.

¶ 20    On July 14, 2005, defendant's father arrived at Area 2 and spoke privately with defendant. Shortly thereafter, defendant agreed to give another statement to Detective Fassl with his father present. Detective Fassl read defendant his *Miranda* rights, which defendant

acknowledged and waived. Detective Fassl told defendant that the detectives did not believe he was being truthful to them and they believed defendant's involvement was more than he had stated. Defendant again recounted that he spent the night at Bell's apartment on July 10. Defendant and a friend were outside the building when they saw Jennings leave with her child and drive away. After they took trash out of Bell's apartment, they saw the back window to Jennings' apartment was open. His friend entered first through the back door and they walked around the apartment and defendant took a cell phone while his friend took a second phone and a charger.

¶ 21    Later, defendant went to Rob's Liquor Store at 71st and Woodlawn. While there, he ran into a person he knew from the neighborhood as "Rico," who was "a burglar and a stickup man from the area." Defendant told Rico where there was an "easy lick." Rico asked defendant how he knew that and defendant told him that he had been in the apartment. Rico asked defendant when he wanted to do it. Defendant told Rico that he did not want to go into the apartment, but would act as a lookout. Defendant gave Rico his cell phone number and told Rico to call him to decide when to go to Jennings' apartment. At about 2 a.m. on July 12, 2005, he received a call from Rico, asking defendant to meet him at 73rd and Woodlawn. Defendant met with Rico and they walked to Jennings' apartment building. Defendant pointed out Jennings' apartment to Rico. Rico walked down the gangway while defendant went to the front of 1114 East 73rd. Defendant stated that he did not see how Rico entered Jennings' apartment.

¶ 22    Defendant told the detective that he had been sitting on the stoop for about 15 minutes when he heard a woman screaming. He got up and was going to run westbound, but ran into Rico, who was carrying a black bag. Both men ran eastbound on 73rd. They crossed University and Rico ran northbound into an alley and defendant continued eastbound. A few minutes later,

defendant received a call on his cell phone from a number he did not recognize and he ignored the call. Detective Fassl testified that the number from the call was from Jennings' cell phone.

¶ 23    Defendant went to a friend's house and spent the night. When he awoke that morning, he walked back over to 1114 East 73rd and saw Bell's mother, who told him that her neighbor had been stabbed and killed. Defendant received another call from Jennings' cell phone number, which he answered, and it was Rico. He met with Rico and asked what Rico took from the apartment. Rico told him he took a DVD player and a cell phone. Defendant asked Rico what happened since he knew Jennings had been killed, and Rico told him that Jennings woke up while he was there and because she saw his face, he stabbed her. Defendant asked Rico for some proceeds from the burglary. Rico gave defendant the phone, which defendant started to use. He switched the SIM card from Jennings' phone into his cell phone.

¶ 24    After this conversation, Detective Fassl contacted the Cook County State's Attorney's office felony review unit. Assistant State's Attorney (ASA) Bryan Hofeld came to Area 2 and spoke first with Detective Fassl, and then with defendant and his father. Detective Fassl was present when ASA Hofeld advised defendant of his rights and defendant agreed to speak with him. Defendant then related essentially the same statement as he had given to Detective Fassl. Defendant then agreed to give a videotaped statement to ASA Hofeld. Defendant, his father, ASA Hofeld, and Detective Fassl each signed the consent to videotape statement form. ASA Hofeld again advised defendant of his *Miranda* rights. Defendant then recounted the same statement that he had given to Detective Fassl earlier that night.

¶ 25    The parties stipulated that if called to testify, a medical examiner would have presented testimony about Jennings' autopsy, including that Jennings sustained 17 stab wounds, including wounds to her head, neck, and chest. The medical examiner would have testified that within a

reasonable degree of medical and forensic certainty the cause of death was multiple stab and incised wounds, and the manner of death was homicide.

¶ 26    The State rested after this stipulation and the defense rested without presenting any evidence. Following deliberations, the jury found petitioner guilty of first degree murder.

¶ 27    At defendant's sentencing hearing, the parties presented evidence in aggravation and mitigation. The defendant's presentence investigation (PSI) disclosed the following. He was 15 years old at the time of the homicide. Since his incarceration at the Juvenile Temporary Detention Center, defendant was attending 11th grade and was ranked first in his class. At age two, defendant was placed with his aunt after his sister was injured in the family home. When he was eight years old, he was returned to his mother's care. He described his childhood as normal and has a good relationship with both of his parents. He denied any history of abuse and was the only member of his immediate family who had contact with the criminal justice system. He joined the Gangster Disciples at age 15, but "terminated his affiliation" at age 16.

¶ 28    In aggravation, the State presented victim impact statements and noted that defendant had been found with a contraband cell phone after a courtroom visit. The prosecutor argued that the murder was "defendant's responsibility because he is the one who planned the crime." He led the other perpetrator to Jennings' apartment and served as a lookout. The State requested defendant be sentenced to "a substantial time in the penitentiary."

¶ 29    In mitigation, defense counsel focused on defendant's young age and that defendant thought "it was nothing more than a burglary," but was then accountable for Jennings' murder. Counsel presented defendant's school records, certificates for achievement while in juvenile detention, and letters on defendant's behalf from a reading specialist and an author and motivational speaker. Counsel also urged the court to consider that defendant had no criminal

9

record. At the conclusion of the hearing, the court sentenced defendant to a term of 27 years in the Department of Corrections.

¶ 30    On direct appeal, defendant raised several claims, including that defendant was denied the effective assistance of trial counsel because his trial counsel failed to litigate a motion to quash arrest and suppress statements and the trial court abused its discretion in sentencing defendant to an excessive term in prison in light of his age and lack of criminal background. *Snowden*, 2011 IL App (1st) 092117, ¶ 1. This court affirmed defendant's conviction and sentence. *Id*. ¶ 96.

¶ 31    In September 2012, defendant filed his *pro se* petition for relief from judgment pursuant to section 2-1401 of the Code of Civil Procedure (735 ILS 5/2-1401 (West 2012)), alleging: (1) the police failed to properly advise him of his *Miranda* rights; (2) the automatic transfer statute in the Juvenile Court Act (705 ILCS 405/5-130 (West 2012)) was unconstitutional; and (3) his trial counsel was ineffective for failing to contest these and other claims before the trial court. In November 2012, the trial court found that defendant's claims in his 2-1401 petition were more properly brought under the Post-Conviction Hearing Act (the Act) (725 ILCS 5/122-1 *et seq*. (West 2012)) and recharacterized the petition as a postconviction petition. The court admonished defendant about the recharacterization and allowed defendant the opportunity to make decisions about how to proceed. Following the admonitions, the trial court continued the case to a later date to give defendant time to consider the recharacterization of his petition. At the next hearing in February 2013, the court admonished defendant again and defendant agreed to have the court consider his petition under the Act. Defendant's petition was thereafter advanced to the second stage of review and counsel was appointed.

¶ 32    Next, defendant, through counsel, filed a supplemental petition for postconviction relief, arguing that defendant's 27-year sentence violates the eighth amendment to the United States Constitution and the proportionate penalties clause of the Illinois Constitution based on the Supreme Court's decision in *Miller v. Alabama*, 567 U.S. 460 (2012). Specifically, defendant contended that the trial court failed to consider his youth and attendant characteristics, such as, his immaturity, impulsiveness, and his family background, before imposing defendant's sentence. In July 2018, defendant filed a second supplemental postconviction petition further discussing the factors set forth in *Miller* as well as difference between the brains of juvenile and adult offenders.

¶ 33    In May 2019, the State moved to dismiss defendant's postconviction petition, arguing that: (1) defendant's sentencing claim under *Miller* was barred by *res judicata* and meritless because the trial court considered defendant's age and characteristics prior to sentencing, and he did not receive a *de facto* life sentence; (2) defendant's claim that he was not properly read his *Miranda* rights was baseless because he "was not deemed a suspect until he started talking about entering the victim's apartment when he saw the door open;" and (3) defendant's claims regarding the automatic transfer statute and ineffective assistance of trial counsel were legally deficient. Defendant responded and acknowledged that his sentence was not a *de facto* natural life sentence under *People v. Buffer*, 2019 IL 122327, but he asserted that "while the appellate court noted that the trial court did take defendant's age into account when he was sentenced, no other factors expressed in *Miller* were examined ***."

¶ 34    In March 2020, the trial court conducted a hearing on the State's motion. At the conclusion, the trial court granted the State's motion and dismissed defendant's petition in its entirety. In its findings on the record, the court discussed defendant's *Miller* claim as well as the

11

fact that defendant did not receive a *de facto* life sentence. The court acknowledged that recent statutory changes for juvenile offenders regarding the possibility of parole after serving 20 years were not applicable in defendant's case. The court pointed out that the timing of the statute does not render his sentence unconstitutional. The court also observed that he had presided over defendant's trial proceedings and had considered defendant's youth and background in imposing the 27-year sentence. The court further found that the trial counsel was not ineffective because her actions were trial strategy and defendant's claim would not have changed the outcome of the case.

¶ 35    This appeal followed.

¶ 36    The Act provides a tool by which those under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. 725 ILCS 5/122-1(a) (West 2018); *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). "The purpose of [a postconviction] proceeding is to allow inquiry into constitutional issues relating to the conviction or sentence that were not, and could not have been, determined on direct appeal." *People v. Barrow*, 195 Ill. 2d 506, 519 (2001). Thus, *res judicata* bars consideration of issues that were raised and decided on direct appeal, and issues that could have been presented on direct appeal, but were not, are considered forfeited. *People v. Blair*, 215 Ill. 2d 427, 443-47 (2005).

¶ 37    At the first stage, the circuit court must independently review the postconviction petition within 90 days of its filing and determine whether "the petition is frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2018). If the circuit court advances the petition to the second stage, counsel is appointed to represent the defendant, if necessary (725 ILCS 5/122-4 (West 2018)) and the State is allowed to file responsive pleadings (725 ILCS 5/122-5 (West

2018)). At this stage, the circuit court must determine whether the petition and any accompanying documentation make a substantial showing of a constitutional violation. See *Coleman*, 183 Ill. 2d at 381. If no such showing is made, the petition is dismissed. "At the second stage of proceedings, all well-pleaded facts that are not positively rebutted by the trial record are to be taken as true, and, in the event the circuit court dismisses the petition at that stage, we generally review the circuit court's decision using a *de novo* standard." *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). If, however, a substantial showing of a constitutional violation is set forth, then the petition is advanced to the third stage, where the circuit court conducts an evidentiary hearing. 725 ILCS 5/122-6 (West 2018).

¶ 38    Defendant first argues that he made a substantial showing that his 27-year sentence was unconstitutional under both the eighth amendment to the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). Specifically, defendant contends that his sentence violated the Supreme Court's decision in *Miller* because the trial court did not take into account his age and youthful characteristics before imposing defendant's sentence. Defendant discusses the fact that he was 15 years old at the time of the murder and that while he proposed the idea of the burglary of Jennings' apartment and waited outside, he did not participate in her murder. He also notes his rehabilitative potential and family history, including involvement with DCFS. The State asserts that defendant's claim is barred by *res judicata* because he previously challenged his sentence as excessive based on his youth and background on direct appeal.

¶ 39    We agree. On direct appeal, defendant argued that "the trial court abused its discretion in sentencing defendant to a 27-year term in prison because defendant was 15 years old at the time of the offense, he was not inside Jennings' apartment when she was stabbed, and this was his

13

first conviction." *Snowden*, 2011 IL App (1st) 092117, ¶ 85. This court considered defendant's claim and found no abuse of discretion.

"The trial court sentenced defendant for one count of first degree murder. The sentencing range for first degree murder is 20 to 60 years. 730 ILCS 5/5-8-1(a)(1)(a) (West 2008). The trial court imposed a sentence of 27 years, which was within the applicable sentencing range. Nevertheless, defendant argues that the sentence was excessive in light of his age, the mitigating evidence of his school work, his lack of criminal background, and that he was not the individual who stabbed Jennings.

At the sentencing hearing, the trial judge discussed on the record his conclusions in determining defendant's sentence. The judge specifically considered defendant's young age as well as the evidence presented at the hearing and the evidence at trial. The judge also noted that there was '[n]o evidence to suggest that [defendant] was in the apartment when this happened. *** There is evidence to conclude he was in the apartment before it happened and the fact of the matter is it wouldn't have happened but for him.' The judge further stated that while the 'evidence doesn't show that [defendant] intended for this to happen to Ms. Jennings,' defendant 'has to be held responsible for Ms. Jennings' death consistent with the jury's verdict.'

Based on the entire record before us and given the nature of the crime and defendant's role in facilitating the burglary that led to Jennings' death, we do not find that the trial court abused its discretion. Defendant received a sentence on the low end of the sentencing range, only 7 years over the minimum and 33 years less

14

than the maximum sentence. The trial court clearly considered all factors in

aggravation and mitigation and was especially cognizant of defendant's young

age and his level of involvement in the crime when imposing the sentence.

Accordingly, we hold that the trial court's sentence of 27 years' imprisonment

was not an abuse of discretion." *Id*. ¶¶ 88-90.

¶ 40     While defendant's direct appeal predated *Miller*, this court considered the same

mitigating factors he asserts merit review in a new sentencing hearing. We observed that " '[i]f

the sentence imposed is within the statutory range, it will not be deemed excessive unless it is

greatly at variance with the spirit and purpose of the law or is manifestly disproportionate to the

nature of the offense.' " *Id*. ¶ 87 (quoting *People v. Starnes,* 374 Ill. App. 3d 132,143 (2007)).

Thus, in reviewing defendant's sentence, we inherently considered whether his sentence was

disproportionate to the offense and his involvement.

¶ 41     In this appeal, he argues that his sentence violates the eighth amendment of the United

States Constitution and proportionate penalties clause of the Illinois Constitution because the

sentencing court did not take into account his youthful characteristics and background, including

his immature mind, difficult childhood, and his prospects at rehabilitation. His age, childhood,

and his work and certificates earned while incarcerated were admitted at the sentencing hearing

and considered by the trial court. Since this court already reviewed defendant's sentence based

on these same mitigating factors and concluded the sentence was not disproportionate, his claim

is barred by *res judicata,* and the trial court properly dismissed it at the second stage.

¶ 42     Nevertheless, even if defendant's sentencing claim was not barred by *res judicata*, *Miller*

is not implicated here because defendant did not receive a *de facto* life sentence.

¶ 43     The sentencing of juvenile defendants has been evolving in the country over the last

15

several years. Beginning with *Roper v. Simmons*, 543 U.S. 551 (2005), the United States Supreme Court weighed in and set forth new constitutional parameters for the sentencing of juvenile offenders. See also *Graham*, 560 U.S. 48, *Miller*, 567 U.S. 460, and *Montgomery v. Louisiana*, 577 U.S. 190, 209-12 (2016). "[T]he United States Supreme Court has advised that 'children are constitutionally different from adults for purposes of sentencing.' " *People v. Lusby*, 2020 IL 124046, ¶ 32 (quoting *Miller*, 567 U.S. at 471). In *Miller*, the Court barred mandatory life sentences for juveniles who commit murder. *Id*. *Miller* has since been held to apply retroactively. *Montgomery*, 570 U.S. at 212; see also *People v. Holman*, 2017 IL 120655, ¶ 38 (recognizing that *Miller* applied retroactively). Most recently, the Supreme Court held that the eighth amendment allows juvenile offenders to be sentenced to life without parole as long as the sentence is not mandatory and the sentencing court had discretion to consider youth and attendant characteristics but that no factfinding by the sentencer is required. *Jones v. Mississippi*, 593 U.S.____, ____, 141 S. Ct. 1307, 1314-15 (2021).

¶ 44    In light of these cases from the United States Supreme Court, the Illinois Supreme Court has developed its own evolving jurisprudence regarding *Miller*-related sentencing claims raised by juvenile defendants. In *People v. Reyes*, 2016 IL 119271, ¶ 9, the supreme court relied on *Miller* to conclude that a *de facto* life sentence violated the eighth amendment when applied to juveniles. The *Reyes* court observed that "*Miller* makes clear that a juvenile may not be sentenced to a mandatory, unsurvivable prison term without first considering in mitigation his youth, immaturity, and potential for rehabilitation." *Id*. The supreme court in *People v. Buffer*, 2019 IL 122327, ¶¶ 41-42, concluded that a sentence over 40 years is considered a *de facto* life sentence for juvenile defendants, requiring the sentencing court to consider the defendant's youth and attendant circumstances.

¶ 45    Here, the trial court sentenced defendant to a term of 27 years, significantly less than a *de facto* life sentence under *Buffer*. Although defendant initially contended that his 27-year sentence violated both the eighth amendment and the proportionate penalties clause, he has now conceded his sentence does not violate the eighth amendment. However, he maintains that his sentence violates the proportionate penalties clause.

¶ 46    Under the proportionate penalties clause, all penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship. Ill. Const. 1970, art. I, § 11; *People v. Rizzo*, 2016 IL 118599, ¶ 28. "The purpose of the proportionate penalties clause is to add a limitation on penalties beyond those provided by the eighth amendment and to add the objective of restoring the offender to useful citizenship." *People v. Minniefield*, 2020 IL App (1st) 170541, ¶ 35 (citing *People v. Clemons*, 2012 IL 107821, ¶ 39). The proportionate penalties clause calls for the balancing of the retributive and rehabilitative purposes of punishment, which requires careful consideration of all factors in aggravation and mitigation, including the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well as the nature and circumstances of the crime and of defendant's conduct in the commission of it. *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002).

¶ 47    To support his claim that a *de facto* life sentence is not required for *Miller* protections to apply, defendant relies on *People v. Barnes*, 2018 IL App (5th) 140378, *People v. Womack*, 2020 IL App (3d) 170208, and *People v. Robinson*, 2021 IL App (1st) 181653. We find each of these cases distinguishable.

¶ 48    Both *Barnes* and *Womack* considered the mandatory firearm enhancement in cases where the defendants did not commit a homicide. In *Barnes*, the Fifth District found "the sentencing

17

scheme employed by the trial court, as applied to [the] defendant, violate[d] the proportionate penalties clause of the Illinois Constitution, as it shocks our community's evolving standard of moral decency." *Barnes*, 2018 IL App (5th) 140378, ¶ 25. The *Barnes* court observed that no one was injured during the armed robbery and that the gun displayed was unloaded, as well as the defendant's apology and remorse. *Id*. We point out that *Barnes* predated the supreme court's decision in *Buffer*.

¶ 49    Similarly, in *Womack*, the defendant alleged in a successive postconviction petition that he had established cause and prejudice to bring an as-applied claim that the firearm enhancement violated the proportionate penalties clause. *Womack*, 2020 IL App (3d) 170208, ¶ 13. Citing *Barnes*, the majority concluded that the mandatory enhancement as applied to the defendant violated the proportionate penalties clause insofar as the enhancement did not comport with "Illinois's evolving standard of decency" in this case. *Id*. ¶ 15. While the majority did not address *Buffer*, nor that the defendant's sentence was not a *de facto* life sentence, the dissenting justice found no proportionate penalties violation under *Buffer*. See *id.* ¶ 43 (Schmidt, J., *dissenting*).

¶ 50    In *Robinson*, the appellate court reversed the trial court's summary dismissal of the defendant's *pro se* postconviction petition and remanded for second-stage proceedings where the defendant entered into a negotiated plea for a 35-year sentence for first degree murder after being admonished that he faced a potential 20-to-60-year sentence. *Robinson*, 2021 IL App (1st) 181653, ¶¶ 1, 6, 8, 33. The defendant alleged that he was denied a fair sentencing hearing because the circuit court did not consider his youth when it accepted his guilty plea, and his plea was secured by the threat of a now unconstitutional *de facto* life sentence. *Id*. ¶ 17. The reviewing court found that the defendant's petition stated the gist of a constitutional claim that

"his plea was secured by the threat of a *de facto* life sentence" and remanded for further second-stage proceedings under the Act. *Id.* ¶¶ 36-37.

¶ 51    We conclude the analysis in *Robinson* is no longer valid following the Illinois Supreme Court's decision in *People v. Jones*, 2021 IL 126432. In *Jones*, the juvenile defendant, who was facing a mandatory life sentence, entered into a negotiated plea agreement with the State in which the defendant would plead guilty to one count each of first degree murder and residential burglary and two counts of armed robbery in exchange for the dismissal of the remaining charges and concurrent sentences of 50 years for murder, 30 years for each armed robbery count, and 15 years for residential burglary. *Id*. ¶ 4. Subsequently, the defendant sought leave to file a successive postconviction petition, arguing that his guilty plea and judgment were entered years before the decision in *Miller* and that the mandatory statutory sentencing scheme that was applied to him at that time was void when applied to juveniles. *Id.* ¶ 7. The trial court denied the motion, and the appellate court affirmed the denial. *Id.* ¶¶ 7-10.

¶ 52    Our supreme court in *Jones* observed that voluntarily entering a guilty plea waived all nonjurisdiction errors, including constitutional errors that could not have been apparent until later. *Id.* ¶ 20. To avoid the mandatory sentence of life imprisonment that he would have received if he had been convicted of other charges, the defendant made a deal with the State and pleaded guilty in return for 50 years' imprisonment. See *id.* ¶ 25. Thus, he waived any constitutional challenge to the agreed-upon sentence of 50 years' imprisonment. See *id.* ¶ 20. This waiver remained effective despite any later changes in the law regarding the sentencing of juveniles. "[A]bsent misrepresentation or other impermissible conduct by state agents [citation], a voluntary plea of guilty intelligently made in the light of the then applicable law does not become vulnerable because later judicial decisions indicate that the plea rested on a faulty

19

premise." (Emphasis and internal quotation marks omitted.) *Id.* ¶ 23.

¶ 53    This court also recently held that following *Jones*, the defendant's sentencing challenge under a blind plea was not cognizable under *Miller* where the defendant's plea was voluntary, and the trial court exercised its discretion in imposing a 48-year sentence for first degree murder. *People v. Aceituno*, 2022 IL App (1st) 172116, ¶ 58.

¶ 54    For these reasons, we find that none of these cases relied on by defendant support his argument that his 27-year sentence for first degree murder violated the proportionate penalties clause under *Miller*.

¶ 55    We also reject defendant's claim that his case is similar to the circumstances present in *People v. Leon Miller*, 202 Ill. 2d 328 (2002). In that case, the supreme court held that a mandatory sentence of natural life violated the proportionate penalties clause when applied to the juvenile defendant. The supreme court found that the convergence of the juvenile transfer statute, the accountability statute, and the multiple murder sentencing statute eliminated the trial court's ability to consider any mitigating factors such as age or degree of participation. *Id.* at 342-43. The *Leon Miller* court held that the mandated penalty distorted the case's factual realities and did not accurately represent the defendant's personal culpability, such that it shocked the moral sense of the community. *Id*. at 341. The court noted that the defendant was 15 years old, had one minute to contemplate whether to participate in the incident, and stood as a lookout during the shooting but never handled a gun. *Id.*

¶ 56    While defendant in this case was subject to the juvenile transfer statute and was held accountable for Jennings' murder, he was not subject to a mandatory life sentence. The supreme court's analysis in *Leon Miller* focused on the lack of any discretion allowed by the trial court in imposing the mandatory life sentence and its ability to consider the defendant's involvement.

Here, the trial court imposed a discretionary sentence which was significantly lower than mandatory life. Further, defendant in this case was more culpable than the defendant in *Leon Miller*. Here, the burglary that led to Jennings' death was defendant's idea. He accompanied his accomplice to Jennings' apartment and waited outside as a lookout while his accomplice entered to commit the burglary. Even though defendant did not intend for Jennings to be murdered, he participated in the planning of the criminal acts that ultimately led to her death. Therefore, we find *Leon Miller* distinguishable from the facts of this case.

¶ 57    Our review of defendant's argument and the cases relied upon fail to establish that a non *de facto* life sentence can support a proportionate penalties violation under *Miller*. Here, defendant received a discretionary sentence of 27 years for first degree murder. While we acknowledge that he was 15 years old at the time of the offense and was not an active participant in the death of Jennings, we do not believe that such a sentence shocks the conscience. The burglary was committed at defendant's prompting and he went to that location with his accomplice. He was later found with Jennings' phone after the burglary and murder. Defendant has not cited any relevant authority that extended *Miller* protections under the proportionate penalties clause for a sentence less than a *de facto* life sentence and we decline to do so here.

¶ 58    Moreover, even if defendant's proportionate penalties claim had merit, which we do not find, the trial court properly considered defendant's youth and degree of participation at his sentencing hearing. The supreme court has held that a *de facto* natural life sentence for a juvenile imposed prior to *Miller* is not invalid if the record established that the trial court considered the defendant's youth and attendant characteristics at sentencing. *Lusby*, 2020 IL 124046, ¶ 52.

¶ 59    All of the mitigating evidence defendant relies on now was presented to the trial court at sentencing. In dismissing this postconviction claim, the trial judge observed that he had also

presided over defendant's trial and sentencing and had considered the factors in aggravation and mitigation at that time.

> "I do believe that the Court -- and I was the judge who presided over Mr. Snowden's trial and sentencing. I believe I was very cognizant of the fact that he was 15 years old at the time of the offense. I was very cognizant of those circumstances identified in the presentence investigation report and considered the well-stated arguments of his trial counsel *** regarding the fact that he was of a particular age and should not be given the same kind of punishment that someone who committed this offense and was over the [age of] 18 might have, and I believe the fact that he received the sentence of 27 years for his involvement in the stabbing of a woman in her home and the resulting death during some kind of burglary, some kind of taking of her property, is such that it is clear both from the nature of the sentence and the comments that the Court made at the time of the sentencing that this sentence does comply with Miller, Buffer and People versus Lusby as I mentioned."

¶ 60     As stated, the trial judge was well aware of defendant's age, childhood background, degree of culpability, and rehabilitative potential at sentencing. This evidence was before the trial judge at sentencing and the court stated that he considered such evidence before imposing the sentence. Our review of the sentencing proceedings confirm that the trial court was presented with this information and weighed defendant's youth and background before sentencing defendant to a term of 27 years. Defendant has failed to set forth a substantial showing that his sentence violates the proportionate penalties clause.

¶ 61    Next, defendant contends that he made a substantial showing of a constitutional violation of his *Miranda* rights. Specifically, he asserts that the police detectives violated his *Miranda* rights by questioning him first, then instructing him on his rights, and then continuing the interview. Defendant further argues that his trial counsel's failure to litigate a viable *Miranda* claim constituted ineffective assistance of counsel. The State responds that defendant's claim that his confession was involuntary is barred by *res judicata* because he argued on direct appeal that his trial counsel was ineffective for failing to litigate a motion to suppress defendant's statements.

¶ 62    As previously stated, *res judicata* bars defendant from relitigating claims previously raised and rejected. *People v. English*, 403 Ill. App. 3d 121, 131 (2010). Defendant's motion to suppress alleged that prior to his interrogation, defendant was not informed of his right to remain silent, that anything he might say or do could be used against him in court, he had a right to consult with a lawyer and have a lawyer present during the interrogation, and if he was indigent, he would be provided a lawyer by the State to be present during his interrogation. Counsel further alleged that "due to the physical, physiological, mental, educational and/or psychological state, capacity and condition of the defendant, he was incapable and unable to appreciate and understand the full meaning of his *Miranda* rights." Although counsel filed this motion, it was never litigated prior to trial.

¶ 63    On direct appeal, defendant argued that his trial counsel was ineffective because "the voluntariness of his statements to the police should have been challenged because he was a minor at the time and was questioned initially without a parent present and he had not been given his *Miranda* warnings." *Snowden*, 2011 IL App (1st) 092117, ¶ 71.

¶ 64    This court considered defendant's claim and reasoned as follows.

23

"In this case, despite defendant's young age, his statements were voluntary. He received *Miranda* rights at least four times. He was first informed of these rights immediately after he made an inculpatory statement about entering Jennings' apartment on July 11. He then received *Miranda* rights prior to all further statements. ASA Hofeld testified that when he advised defendant of his *Miranda* rights, he made defendant tell him what each of the rights meant to ensure that defendant understood the rights he was waiving. He was able to speak with each of his parents privately before continuing any questioning, and when his mother did not return to the police station, the police had a youth officer present during questioning. Both defendant and his father signed a consent form to give a videotaped statement. *** Additionally, ASA Hofeld asked defendant outside the presence of police officers and while his father was present if he had been treated well at the police station and defendant said he had and made no complaints.

Given the circumstances of defendant's statements, it is unlikely that the motion to suppress would have been granted. The record supports the voluntary nature of his statements. Defendant was advised of his *Miranda* rights more than once and was asked to explain the rights to demonstrate his understanding. He was able to speak privately with his parents before continuing questioning and his parents or a youth officer was present during questioning. Defense counsel's decision not to litigate the motion to suppress was a matter of trial strategy and defendant cannot show the motion had a reasonable likelihood of success. Accordingly, defendant failed to establish that his attorney's performance was deficient." *Id.* ¶¶ 73-74.

24

¶ 65    Defendant contends that his current *Miranda* claim differs from the issue raised on direct appeal because on direct appeal, his argument was based on an involuntary statement, rather than the police employing a question-first, warn-later technique during defendant's interview. We disagree with defendant. Trial counsel's motion specifically alleged that defendant had been questioned prior to receiving his *Miranda* rights and defendant contended on direct appeal that he had been questioned without being given these rights. While defendant did not refer to the police's question-first, warn-later technique, he asserted in part that his confession should have been suppressed because he was questioned prior to being advised of his *Miranda* rights. Defendant raised essentially the same claim on direct appeal. Accordingly, it is barred by *res judicata* and the trial court properly dismissed this claim at the second stage.

¶ 66    Again, even if defendant did not raise this precise issue on direct appeal, defendant has forfeited this claim by failing to raise it. We note that defendant has not alleged that his appellate counsel was ineffective for failing to present this claim on direct appeal.

¶ 67    Claims that could have been raised on direct appeal but were not, are forfeited in postconviction. *People v. Petrenko*, 237 Ill. 2d 490, 499 (2010). Defendant attempts to avoid forfeiture by contending that defendant's claim raised factual allegations outside the record. See *People v. Munson*, 206 Ill. 2d 104, 132 (2002) ("where a defendant relies on matters outside the record in support of a post-conviction claim, we will not find waiver"). However, the only facts outside the trial record are his own statements that he had not been in a situation like that before, he was not told that he should decline to talk, and the door to the interrogation room was locked. Defendant did not attach any affidavits or additional documentation to his petition. His statements fall more within the voluntariness of his confession, as addressed on direct appeal, rather than the questioning technique employed by the police. The bulk of his argument relating

to the interrogation comes from the trial testimony of Detectives Almazan, Fassl, and Durkin. Trial counsel's failure to challenge his statement based on this questioning technique is derived from facts contained in the trial court record. Therefore, this claim could have been raised on direct appeal, and defendant's failure to do so results in its forfeiture. Accordingly, the trial court properly dismissed this postconviction claim at the second stage.

¶ 68    Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 69    Affirmed.